Robert H. HAGGERTY, Robert C. Graham, and Kirk Parrish, Individually and On Behalf of All Other Persons Who Are Class I Limited Partners of Comstock Gold Company, L.P., Plaintiffs,

v.

COMSTOCK GOLD COMPANY, L.P., United Mining Corporation, Raynham Hall Contracting, Inc., Timothy Collins, Maurice Castagne, George Werk and Alice Werk, Defendants.

Howard T. BELLIN, M.D. and Robert M. Giller, M.D., Intervenor–Plaintiffs,

v.

COMSTOCK GOLD COMPANY, L.P., United Mining Corporation, Raynham Hall Contracting, Inc., Timothy Collins, Maurice Castagne, George Werk and Alice Werk, Defendants.

No. 84 Civ. 7671 (PKL).

United States District Court,
S.D. New York.

May 29, 1991.

**112**

Francis R. Jones, New York City, for plaintiffs Robert C. Graham, Kirk Parrish, Howard T. Bellin, M.D. and Robert M. Giller, M.D.

Robert H. Haggerty, pro se.

Bruce H. Beckmann, P.C., New York City (Lynn Armentrout, Bruce H. Beckmann, of counsel), for defendants Comstock Gold Co., L.P., United Mining Corp., Raynham Hall Contracting, Inc., Timothy Collins and Maurice Castagne.

### ORDER AND OPINION

LEISURE, District Judge:

This is an action for violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b promulgated thereunder, as well as pendent state law claims for fraud, rescission, and breach of contract and fiduciary duties. The parties have cross-moved for summary judgment. For the reasons set forth below, the cross-motion of defendants Comstock Gold Company, L.P., United Mining Corporation, Raynham Hall Contracting, Inc., Timothy Collins and Maurice Castagne (collectively

"the Moving Defendants") is granted, and plaintiffs' cross-motion is denied.[1]

### Background

The instant action arises out of the sale to plaintiffs of limited partnership shares in defendant Comstock Gold Company, L.P. ("Comstock") in 1978 and 1979. Comstock was organized in 1978 by defendants United Mining Corporation ("UMC") and Timothy Collins ("Collins") to explore for and mine gold and silver in the Comstock Lode near Virginia City, Nevada. The first offering occurred in December 1978, when Comstock, UMC and Collins issued a private placement memorandum (the "1978 Memorandum") offering for sale $1,600,000 in Class I limited partnership interests, in ten units of $160,000 each. When this offering did not result in a sale of all ten units, a second offering was made in March 1979 with the issuance of a substantially identical private placement memorandum (the "1979 Memorandum"), offering sufficient units, again at $160,000 per unit, to reach the original goal of raising $1,600,-000.

Plaintiff Robert C. Haggerty was at the time of his investment a senior partner with the New York law firm of Dewey, Ballentine, Bushby, Palmer & Wood. Plaintiff Robert C. Graham was the president of a real estate company and president of the Graham Gallery, Ltd. Plaintiff Kirk Parrish was the executive vice president of an advertising company, and had previously been president of Life Savers, Inc., the American Chicle Company, and Lanvin Charles of the Ritz, and a director of the Squibb Corporation. Plaintiff Howard T. Bellin, M.D. was a surgeon in New York, as well as president of Bellin's Department Store, Bellin Aviation, and Speed Flying Service. Plaintiff Robert Giller, M.D. was a doctor in New York. All of the plaintiffs were experienced in tax shelter investments, all were college graduates,

---

1. The Moving Defendants have also cross-moved, in the alternative, pursuant to Fed.R. Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim. Because the parties have also cross-moved for summary judgment,

and have submitted papers beyond the four corners of the complaint, the Court will treat the Moving Defendants' cross-motion solely as one for summary judgment. *See La Bounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991).

and all had incomes that placed them in the top tax bracket.

The 1978 Memorandum and 1979 Memorandum (collectively, "the Offering Memoranda") included the following warnings regarding the proposed investment in Comstock:

THE INVESTMENT DESCRIBED HEREIN INVOLVES SUBSTANTIAL RISKS AND IS OFFERED ONLY TO INDIVIDUALS WHO CAN AFFORD SUCH RISKS. SEE "PRINCIPAL RISK FACTORS" HEREIN. THERE WILL BE NO PUBLIC MARKET FOR THE UNITS, AND RESALES AND OTHER TRANSFERS ARE LIMITED BY FEDERAL AND STATE SECURITIES LAWS, THE INTERNAL REVENUE CODE, AND THE LIMITED PARTNERSHIP AGREEMENT. SEE ALSO "CONFLICTS OF INTERESTS," AND "FEDERAL INCOME TAX CONSEQUENCES" FOR ADDITIONAL RISK CONSIDERATIONS.

Offering Memoranda at cover page.

Of course, there can be no assurance that [gold and silver] reserves will be discovered in commercially recoverable quantities or, if reserves are discovered, that a sufficient quantity of gold and silver will be extracted to pay operating expenses and/or a return on the investment made in the Partnership.

Offering Memoranda at 2.

Estimates of profit, loss and cash flow have been made by the General Partners through 1984. However, there is no assurance whatsoever that the Partnership will ever operate at a profit or that distributions, if made, will equal those estimated by the General Partners at the present time.

1979 Memorandum at 3.[2]

Each prospective Class I Limited Partner must take into account the fact that all of his notes will be presented for payment and that the Partnership may never be in a position to make any cash distributions. The risk factors relating to investment in the Partnership are set forth in this memorandum; they should be carefully reviewed by any prospective investor before subscribing for any Class I Limited Partnership interest in the Partnership.

Offering Memoranda at 4.

Each prospective Limited Partner is urged to study this memorandum very carefully and to review the risks discussed therein with his own income tax advisor. Neither this memorandum nor the financial estimates made by the General Partners represent assurances of financial or tax results or purport to represent income tax advice to prospective Limited Partners.

Offering Memoranda at 5.

INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY COMMUNICATION, WHETHER WRITTEN OR ORAL, FROM THE PARTNERSHIP OR ITS GENERAL PARTNER, EMPLOYEES OR AGENTS, AS LEGAL, TAX, ACCOUNTING, INVESTMENT OR OTHER EXPERT ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANTS, AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX, ACCOUNTING AND RELATED MATTERS CONCERNING HIS INVESTMENT.

Offering Memoranda at 6.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK (SEE *"PRINCIPAL RISK FACTORS"*) AND, CONSEQUENTLY, THE PURCHASE OF UNITS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT.

Offering Memoranda at 6 (emphasis in original).

Each investor seeking an interest as a Limited Partner will be required to represent that his net worth is in excess of three times his proposed maximum investment or $480,000 per unit and that he is experienced in business and/or investments. It will further be required that such investor represent that by vir-

---

**2.** Substantially identical language is found in the 1978 Memorandum at 3.

tue of his own investment acumen and business experience he is capable of evaluating the hazards and merits of participation in this offering, or that he has consulted with and is relying upon the advice of his own personal legal and tax advisors in making this investment decision. Additionally, he will have to represent that he can bear the economic risks attendant upon this investment by holding for an indefinite period the securities offered hereby with the possibility of loss of his entire investment.

Offering Memoranda at 8.

Following these statements, the Offering Memoranda identify thirteen "Principal Risk Factors," six of which are identified as "Partnership Risks" and seven as "Mining and Business Risks." These include statements that:

> The Partnership has never before engaged in its proposed business and has not undertaken any mining activities to date.

Offering Memoranda at 18.

> Although the report of Maurice Castagne, P.E. dated November 3, 1978 ... indicates the likelihood of substantial economically recoverable gold and silver reserves, based upon the available geological data described in the report, there is no assurance as to the actual amount or quality of such reserves.

Offering Memoranda at 19.

The project ultimately failed and plaintiffs commenced this action, asserting a securities fraud claim, as well as pendent state law claims. Plaintiffs allege, *inter alia*, that the Offering Memoranda contained false or materially misleading statements, or material omissions, in violation of § 10(b) of the Securities Exchange Act of 1934.

### Discussion

#### I. Section 10(b) Claim

■ It is well settled in this Circuit that in order to sustain a claim under § 10(b) a plaintiff must allege and prove " 'material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security.' "

*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 581 (2d Cir. 1990) (quoting *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986)). Plaintiffs allege that the Offering Memoranda contain several material misstatements and omissions. The Court will discuss these *seriatim*.

Plaintiffs argue that several statements in the Offering Memoranda were materially misleading in making estimates of ore reserves at the property, in making cost estimates, in making estimates as to the amounts of recoverable gold and silver reserves, and in making estimates as to profits, losses and cash flow. However, courts in this Circuit have repeatedly held that, with respect to future projections, there is no liability under § 10(b) for statements in an offering memorandum that "bespeaks caution." *See Luce, supra*, 802 F.2d at 56; *Griffin v. McNiff*, 744 F.Supp. 1237, 1253 (S.D.N.Y.1990) ("warnings and disclaimers may limit the extent to which an investor can rely on the offering documents as a forecast of future events."); *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 162 (S.D.N.Y.1990) (cautionary language in a prospectus limits the extent to which a plaintiff may reasonably rely on statements and data therein); *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1201–02 (S.D.N.Y.1990) (Walker, J., sitting by designation); *Friedman v. Arizona World Nurseries Limited Partnership*, 730 F.Supp. 521, 541 (S.D.N.Y.1990) (warnings and disclaimers limit degree to which an investor may reasonably rely on offering memoranda as forecast of future), *aff'd without opinion*, 927 F.2d 594 (2d Cir.1991); *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 227 (S.D.N.Y.1989) (Leisure, J.); *Stevens v. Equidyne Extractive Industries 1980, Petro/Coal Program 1*, 694 F.Supp. 1057, 1063 (S.D.N.Y.1988) ("no liability attaches to an offering memorandum that purports to be speculative."); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 171 (S.D.N.Y.1988) (no reasonable reliance where offering memorandum stated that estimates were speculative).

In the case at bar, the *Offering Memoranda* did far more than "bespeak caution." *Luce, supra,* 802 F.2d at 56. Rather, they "virtually bristle with warnings" as to the extremely risky nature of the investment described therein, as well as the highly speculative nature of the memoranda's projections as to future results. *See CL–Alexanders Laing, supra,* 739 F.Supp. at 162.[3] Sophisticated investors such as the plaintiffs herein cannot, therefore, have reasonably relied on the Offering Memoranda as an accurate forecast of the future performance of their investments.

▮ Plaintiffs also claim, incredibly, that they did not realize that the proceeds of their investments in Comstock would be sufficient only to carry out the initial exploration and development phase of the project, and would not support the project through the production phase. Plaintiffs point to a "preliminary report" prepared in August 1978 by defendant Maurice Castagne ("Castagne"), a professional mining engineer, that indicates that "Phase I" of the project would cost $1,480,000. The "preliminary report" also indicates that Phase I would consist of initial exploration and development of the mining site, after which a decision could be made as to whether production would be economically feasible. The preliminary report was not included with the Offering Memoranda, however, a "supplement report," prepared by Castagne in November 1978, was included.

Plaintiffs argue that the failure to include the "preliminary report" with the *Offering Memoranda* or to otherwise indicate that the investment proceeds would be used only for exploration and development and not production was a materially misleading omission. This argument must fail on the ground that there simply was no such omission. The section in the Offering Memoranda entitled "Use of Proceeds" plainly states that the funds contributed by the limited partners will "pay for exploration and development of the Partnership's gold property." Offering Memoranda at 10. There is *no* indication that plaintiffs' investments would finance production.

Moreover, Castagne's "supplement report" concludes only that "PHASE I of the development program" is feasible, and that "[t]his program is important for the *initial* assessment of the ... properties." Supplement Report at 2 (emphasis added). The "supplement report" then clearly states that "[e]ntry into the ore zone would allow studies determining a course of action relative to additional development and production." Supplement Report at 2. "Ground conditions, relative to controls, and/or support, will only be known after the area has been opened and tested." Supplement Report at 4. Castagne's cost estimates for Phase I alone, as detailed in the supplement report, totalled at least $1,200,000, making it even more obvious that full-scale development and production would not be funded solely by the monies raised from plaintiffs' limited partnership shares. Accordingly, if experienced investors such as plaintiffs—having read the offering memorandum and the "supplement report" attached thereto—actually believed that their investments would pay for the complete exploration, development and production of the mining properties, such a belief was unreasonable as a matter of law and cannot support an action for securities fraud. *See O'Brien, supra,* 719 F.Supp. at 227–28. " 'The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment.' " *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 486 (2d Cir.1979) (quoting *Hirsch v. du Pont,* 553 F.2d 750,

---

**3.** Particularly clear are the following caveats: Of course, there can be no assurance that reserves will be discovered in commercially recoverable quantities or, if reserves are discovered, that a sufficient quantity of gold and silver will be extracted to pay operating expenses and/or a return on the investment made in the Partnership.
Offering Memoranda at 2.

[T]here is no assurance whatsoever that the Partnership will ever operate at a profit or that distributions, if made, will equal those estimated by the General Partners at the present time.
1979 Memorandum at 3. Substantially identical language is found in the 1978 Memorandum at page 3.

763 (2d Cir.1977)), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980).

■ Finally, plaintiffs allege that defendants UMC and Collins organized defendant Raynham Hall Contracting, Inc. ("Raynham Hall") for the purpose of contracting with Comstock to perform developmental and production work. Plaintiffs further assert that the contract with Raynham Hall provided for fixed compensation insufficient to permit the contract to be economically performed by Raynham Hall, and that defendants UMC, Collins and Castagne "knew or should have known" this to be true. Amended Complaint ¶ 35.

There is, however, no evidence that the Moving Defendants made any misleading statements or failed to disclose any information that was not known to the rest of the market. *See Brown, supra,* 735 F.Supp. at 1203. Moreover, there is no evidence that the Moving Defendants had the requisite *scienter,* rather than that they merely underestimated the cost of the mining operations. The mere fact that an estimate is understated or overstated does not give rise to an inference of fraudulent intent. *See Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 668 (S.D.N.Y.1987); *Schwartz v. Novo Industri, A/S,* 658 F.Supp. 795, 799 (S.D.N.Y. 1987) (Weinfeld, J.). As is true of much of their complaint, plaintiffs' argument with respect to the Raynham Hall contract is an example of alleging "fraud by hindsight," and thus it must fail. *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.); *Schwartz, supra,* 658 F.Supp. at 795.[4]

## II. Pendent Claims

Dismissal of pendent state law claims is appropriate where the federal claims to which they were appended have been dismissed by the Court. See *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *CL–Alexan-*

*ders Laing, supra,* 739 F.Supp. at 167 ("Absent exceptional circumstances … a federal court should refrain from exercising pendent jurisdiction when federal claims are disposed of by summary judgment."). Accordingly, those claims are dismissed for lack of subject matter jurisdiction.

### Conclusion

For the reasons set forth above, the Moving Defendants' cross-motion for summary judgment with respect to the federal securities law claim is granted. The pendent state law claims are dismissed for lack of subject matter jurisdiction. Plaintiffs' cross-motion for summary judgment is denied. Plaintiffs are directed to inform the Court within 30 days of the date of this order as to the status of this action vis-a-vis defendants George Werk and Alice Werk.

SO ORDERED.

---

4. The Court notes that the amended complaint itself fails to state a claim under § 10(b), alleging only that defendants "knew *or should have known*" that the contract was economically infeasible. Amended Complaint ¶ 35. Allegations of negligence are insufficient to support a claim for § 10(b) securities fraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1380–81 n. 12, 47 L.Ed.2d 668 (1976); *IIT, International Investment Trust v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 280 (S.D.N.Y. 1990) (Leisure, J.).